UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. DeMarino Trucking, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Town of Tuxedo, <br><br> Defendant. | No. 20 Civ. 4774 <br><br> **COMPLAINT &** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, E. DeMarino Trucking, Inc., by and through its attorneys, Filosa Graff LLP and Ferrara Law Group, P.C., for and by its complaint against defendants, Town of Tuxedo, alleges as follows:

**PRELIMINARY STATEMENT**

Defendant, the Town of Tuxedo ("Defendant" or "Tuxedo") entered into a lease agreement with Plaintiff, E. DeMarino Trucking, Inc. ("Plaintiff" or "DeMarino") to memorialize their successful long-term arrangement to remediate an environmental waste dumping site in Tuxedo. When negotiating the agreement, Tuxedo advised it was receiving proposals in the $1 million to $1.5 million range to perform the environmental work it needed, but the parties negotiated a mutually beneficial arrangement in which, rather than paying north of a million dollars, Tuxedo would receive DeMarino's remediation work and investment of capital in exchange for granting DeMarino long-term use of part of the remediation site pursuant to a lease. Since 2016, DeMarino has worked assiduously to ensure that waste stored on the dumping site was processed and removed according to New York Department of Environmental Conservation ("DEC") requirements. This yeoman's work entailed not only processing more than 100,000 cubic yards of waste product into usable topsoil, but also working closely with the DEC to ensure that the

1

remediation project complied with its regulatory framework.

Barely three years into the relationship, the new Tuxedo town supervisor Kenneth English ("English") pulled the rug out from beneath DeMarino. DeMarino had already completed work far in excess of that contemplated in its agreement with Tuxedo, and Tuxedo had hidden the true extent of required work when it entered into the lease agreement with DeMarino in the first instance. It advised DeMarino to pack up its equipment and vacate the remediation site immediately. Through its counsel, it disavowed the very existence of the written, 23-page 2016 agreement which Tuxedo drafted. At this point, the DEC had verified remediation and removal of upward of 135,000 cubic yards of environmental waste. At the current time, Tuxedo has reaped the benefits of literally hundreds of thousands of dollars of DeMarino's work for which it has paid nothing. It is now attempting to remove DeMarino from the premises with no payment as if DeMarino had snuck onto the land, processed environmental waste for more than 3 years and had been discovered trespassing. This complaint seeks to compel Tuxedo to honor its commitments under the 2016 lease agreement and to give DeMarino what it is due.

## PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff, E. DeMarino Trucking, Inc., is a New Jersey corporation with a primary place of business located at 3 Westwind Court, Saddle River NJ 07458.

2.  Defendant, Town of Tuxedo is a New York municipal corporation situated in Orange County, New York.

3.  This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

4.  Venue is proper in this judicial district because it is where a substantial part of the

events or omissions giving rise to Plaintiff's claims occurred. *See* 28 U.S.C. § 1391(b).

## ADMINISTRATIVE REQUIREMENTS

5. On May 6, 2020, in compliance with N.Y. Town Law § 65((3), Plaintiff filed a notice of claim with Tuxedo by mailing a draft of a prior version of this complaint, via certified mail to Tuxedo's Town Clerk.

6. As a result, Tuxedo was made aware of the within claims more than forty days ago, as required by N.Y. Town Law § 65(3).

7. Plaintiff also intends to file an amended complaint in this matter that includes tort claims against Tuxedo, as well as Kenneth English, the current town supervisor. Tuxedo has demanded a hearing pursuant to N.Y. Gen. Mun. Law § 50-e and Plaintiff will seek leave to file an amended complaint after the conclusion of that hearing.

8. The contract law claims contained in this complaint are not subject to N.Y. Gen. Mun. Law § 50-e.

9. Any and all other prerequisites to the filing of this suit have been met.

## GENERAL ALLEGATIONS

10. Pursuant to a deed dated October 15, 1999, recorded in the Ocean County, New York Clerk's office in Deed Book 5203, Deed Page 105, New York University conveyed to Tuxedo a 21-acre parcel better known as 984 Long Meadow Road, Municipality of Tuxedo, Orange County, New York (the "Premises")

11. Since the beginning of its ownership of the Premises, Tuxedo has operated a solid waste registered facility there, as well as its municipal Department of Public Works and a soil and woodchip processing facility.

12. On March 8, 2010, the DEC identified several violations of New York law related

to the Premises including, but not limited to violations associated with acceptance of yard waste in excess of the 10,000 per cubic yards per year maximum, a violation of 6 NYCRR § 360-5.3(b)(1)(i), and in connection with wastewater discharges, in violation of 6 NYCRR § 360-1.14(b) and § 360-5.7(b)(3).

13.   An October 18, 2010 DEC inspection revealed that wastewater discharged off the Premises into a freshwater wetland designated SL-12, specifically in violation of ECL Article 24 and NYCRR 663.4(d). The DEC found that Tuxedo had violated a previous Order by Consent entered into with the DEC (#R3-20070627-85) by failing to eliminate "all discharges of mulch/topsoil/compost leachate to waters of the State, in violation of the Order and ECL 17-0803."

14.   On October 11, 2011, Tuxedo entered into Order on Consent #R3-20100630-69 to resolve its multiple violations of New York environmental law in connection with the Premises, a copy of which is attached hereto as **Exhibit A** (the "2011 Order on Consent").

15.   The 2011 Order on Consent required Tuxedo to compete a wide-ranging scope of work to remedy its violations of New York's environmental laws. The work was to be completed in times ranging from "immediately" to within 90 days. Most of the work was related to Tuxedo's failure to ensure that runoff from the Premises did not enter into local waterways and adversely impact wildlife.

16.   What Tuxedo failed to disclose, either to the DEC in 2011 or to DeMarino later on, was that it was physically impossible to perform the scope of work proposed by the DEC in the timeframe it set forth because the environmental devastation Tuxedo had allowed to take place at the Premises extended deep into the soil- in places 18 feet deep, and it would take years, not months, to remedy those conditions. When Tuxedo solicited bids of $1 million to $1.5 million to remediate the Premises, it did not disclose to potential bidders that the work required would

4

represent a multiple of that figure.

17. The work under the 2011 Order on Consent was not completed within 90 days of October 11, 2011 and remains outstanding.

18. On April 13, 2012, the DEC wrote to Tuxedo, advising that "DEC water tests concluded that operations at the Tuxedo mulch site on Long Meadow Road resulted in numerous water quality impairments that caused the mid-March fish kill along Warwick Brook and Four Corners Pond." The "fish kill" involved the deaths of hundreds of fish in waterways in the Rockland County portion of Sterling Forest earlier that month. DEC spokeswoman Wendy Rosenbach stated that "[w]e did test the water and it had low dissolved oxygen which was the source of the fish kill." Geoff Welch with the Ramapo River Committee stated that "[t]hat effluent came down and zapped the oxygen and killed fish along a stretch of several miles at least. It also probably released decomposed algae and eutrophic water with no oxygen." This fish kill took place 12 years after Tuxedo took possession of the Premises and after the time the DEC had allowed Tuxedo to remedy the environmental disaster present there. Tuxedo Supervisor Peter Dolan reported to local press at the time that Tuxedo was contesting the DEC's finding with regard to the fish kill and the finding that Tuxedo had violated the 2011 Order on Consent, but at no time was Tuxedo relieved of its obligations under it, nor was there any finding that Tuxedo was not responsible for the fish kill.

19. In advance of its April 13, 2012 letter, the DEC performed a site-inspection of the Premises along with Tuxedo representatives to discuss violations of the 2011 Order on Consent and steps Tuxedo would need to take to avoid further enforcement efforts. With regard to water quality downstream of the Premises, the DEC concluded that the presence of poisonous runoff gave rise to "numerous violations of the Environmental Conservation Law and regulations,

specifically 6 NYCRR §§ 703 (New York State Surface Water and Groundwater Quality Standards), NY Envtl. Conserv. Law § 17-0501 (General prohibition against pollution), and NY Envtl. Conserv. Law § 17-0803 (Discharge of pollutants without a SPDES Permit)." Among violations of the work mandated by the 2011 Order by Consent, the DEC found that Tuxedo had failed to: reduce the mulch pile to 50 feet in height; submit a plan that details the type, amount and length of time of storage for the material to be accepted at the site, and; submit a stormwater management plan and eliminate all runoff from the site. Said in short, Tuxedo had done essentially nothing to comply with the 2011 Order by Consent.

20. In fact, not only had Tuxedo done essentially nothing to comply with the 2011 Order by Consent, it had taken measures that made the environmental conditions at the Premises worse. In 2006, Tuxedo had hired Perfect Cut Tree Service Inc. ("Perfect Cut"), a landscaping company, to manage the Premises. As a result of Perfect Cut's mismanagement of the Premises prior to 2011, Tuxedo was fined multiple times for the discharge of leachate into local waters which resulted in fish kills. Perfect Cut's mismanagement continued after the 2011 Order of Consent making the mulch pile bigger and more toxic, in violation of the 2011 Order of Consent and myriad New York environmental laws.

21. In 2016, with the work contemplated under the 2011 Order on Consent still not remotely complete and, in fact, made worse by Tuxedo's mismanagement of Perfect Cut, Tuxedo and the DEC entered into a "Consent Order Modification" which outlined significant work to be completed to render the Premises in compliance with DEC regulations (the "2016 Modification"). A copy of the 2016 Modification is attached hereto as **Exhibit B**.

22. The 2016 Modification imposes several stringent requirements on Tuxedo, including acceptance of costs associated with employment of a DEC on-site environmental

monitor and management of mulch processing.

23. With regard to management of mulch processing, the DEC obligated Tuxedo to remove all wood and yard waste at the Premises which had been located there for more than three years by no later than October 15, 2016. With regard to wood and yard waste on site for less than three years, Tuxedo was obligated to remove it no later than December 31, 2016.

24. The 2016 Modification barred Tuxedo from bringing any new material, including yard waste, onto the site, indefinitely.

25. Finally, the 2016 Modification set forth a schedule of penalties against Tuxedo which it would be forced to pay for noncompliance with the modification's timetable. The 2016 Modification contemplated notice and time to cure before the penalties, ranging from $1,000 to $3,000 per day, would be imposed.

26. At about this time, Tuxedo belatedly sought a replacement for Perfect Cut. The Premises were regularly engulfed in flames due to mismanagement of the yard waste stored there and Tuxedo required outside assistance to manage the 21-acre site. Without fully disclosing the full extent of the environmental devastation lurking beneath the surface of the Premises, Tuxedo had informally sought bids for undertaking management of the Premises and received bids in the $1 million to $1.5 range, which the town could not afford (and which would not cover the actual scope of work in any event). Instead, Robert Dollbaum and Michael Broce, both on behalf of Tuxedo, solicited DeMarino to perform remediation work mandated by the DEC under a more favorable arrangement. The parties agreed that that in exchange for DeMarino's work cleaning the Premises, DeMarino would receive use of a portion of the Premises under a long term written lease. Tuxedo also asked DeMarino to identify another contractor to perform a related scope of work related to grinding of logs and stumps and DeMarino identified Ben Veltidi, Inc. ("BVI") as

7

a suitable entity. This arrangement lasted approximately six months to all parties' satisfaction.

27. After starting work on-site, DeMarino met with Robert Dollbaum, town supervisor Michael Ross and the town supervisor and planning board member David McMillan to discuss the terms of a long-term lease arrangement under which in exchange for long-term use of a 2.5 acre portion of the premises, DeMarino would invest in yard waste processing equipment and process the yard waste that the DEC had ordered Tuxedo to process under the 2011 Order of Consent. William Myers of the DEC was also involved in the negotiations and discussed the DEC's requirements with regard to the 2011 Order of Consent and the 2016 Modification.

28. Following these negotiations, in late 2016, Tuxedo presented DeMarino with a 23-page written lease agreement pertaining to a 2.5-acre portion of the Premises titled the "PROPERTY REMEDIATION, LICENSING & PROCESSING AGREEMENT" (the "Lease"). This was the same 2.5-acre parcel that was once leased to Perfect Cut and was the same parcel that DeMarino had leased pursuant to the oral agreement. BVI was also a party to the Lease and received used of a portion of the Premises in exchange for remediation work related to grinding logs and stumps. A copy of the Lease is attached here as **Exhibit C**.

29. The Lease described the leased premises as "2.5 acres of land located outside of the buildings as shown on the attached plan and located on Long Meadow Road in the Town of Tuxedo being a portion of the same premises described in a deed dated December 14, 1999 and recorded in Liber 5203 of Deeds at page 105 in the Orange County Clerk's Office" (the "Leased Premises").

30. The Lease provides that its term would expire on December 31, 2021 with an option for DeMarino to renew.

31. The Lease provides that DeMarino would ostensibly pay "[f]irst year rent calculated on the basis of $6,000 per month, totaling Seventy-Two Thousand AND NO/100

($72,000) DOLLARS per year, payable in twelve equal monthly installments on the first day of each month."

32. However, under the Lease, DeMarino would perform for Tuxedo what the Lease describes as "certain remediation work, labor and services" in lieu payment of rent. The work to be performed by DeMarino was specifically delineated in the Lease as follows:

> [DeMarino] will perform certain remediation work, labor and services for [Tuxedo] in accordance with the Remediation Plan in Schedule A, so as to comply with the DEC Consent Order R3-20100630-89 in Schedule B and so in lieu of the payment of License Fee for a period of time as follows:
>
> \*\*\*
>
> E. DeMarino will remediate the site by removing all leaves, brush, compost, logs, tree stumps concrete (sic), blacktop and etc. (sic) at no cost to [Tuxedo] for a period of TWO YEARS. During this two year period, E. DeMarino will install a screener and grinder to process the materials and may bring leaves and dirt, to mix with the existing materials on the property prior to processing and removal. Additionally, E. DeMarino will install a crushing plant to process the concrete and blacktop materials and may bring in more concrete for the crushing plant. After the Two Year period, E. DeMarino shall commence payment of License Fee at the rate of $3000.00 per month.

33. The Lease also permitted Tuxedo to have all its waste tree products and leaves dumped at the Premises and DeMarino would be obligated to process same without additional payment.

34. At the expiration of the term or in the event of default, the Lease provides that DeMarino:

> [s]hall at once surrender possession of the premises and deliver premises to [Tuxedo] in as good repair and condition as at the commencement of [DeMarino's] occupancy….If possession is not immediately surrendered, [Tuxedo] may take possession of the premises and expel or remove [DeMarino] and any other person occupying all or a portion of the premises."

35. Pursuant to the Lease, DeMarino's use of the Lease Premises was limited to:

> [p]rocessing and sale of clean, tree products (defined as bark, tree limbs (but not leaves, except as incidentally attached to limbs), trunks and stumps) and clean,

9

uncontaminated soil in an environmentally sound and beneficial manner. Additionally, [DeMarino] shall remediate the premises in accordance with the remediation Plan incorporated herein and annexed hereto as Schedule A and in strict accordance with the Town of Tuxedo, Consent Order Modification DEC Case No. R3-20100630-89, a copy of which is annexed hereto as Schedule B and incorporated herein.

36. Schedule A to the Lease is titled "REMEDIATION PLAN" and its written purpose is "to have a written plan for the remediation of the existing wood piles, logs, compost, stumps and dirt that was left on site by former tenant." The "former tenant" is unidentified in the document but is Perfect Cut, whose work went unmonitored for years and resulted in the Premises being overloaded with yard waste to a greater extent than was the case before the 2011 Order by Consent. The only deadline set forth in Schedule A is July 30, 2017- the date by which BVI would have to move stumps and logs from the rear of a Tuxedo highway garage.

37. Schedule B is described in the Lease as the 2016 Modification but is materially different from the one which was ultimately signed by Tuxedo. It does not include the provision that no new material be brought into the Premises without the written approval of the DEC, nor does it include the provision that all material brought on site less than three years prior shall be removed by December 31, 2016. In fact, no deadline was expressed to DeMarino at any time prior to execution of the Lease for the processing of yard waste and it would have been impossible to process literally tens of thousands of yards of yard waste within months of execution of the Lease in any event.

38. The Lease does not contemplate any timeframe for completion of the remediation work which DeMarino was to perform in exchange for a rent abatement. It contains no benchmarks toward reaching completion or even a description of the amount of work required to bring the Premises into DEC compliance. In an email dated August 2, 2017, William Myers of the DEC wrote to DeMarino and Tuxedo employee Robert Dollbaum reminding Tuxedo that "[w]aste

removal is to be at Town expense until the consent order is satisfied," indicating that no deadline had been set for completion of the remediation work. Indeed, deadlines for completion of the remediation work were never even discussed between Tuxedo and DeMarino in advance of execution of the Lease - instead, the agreement contemplated that DeMarino would work as expeditiously as possible.

39.     DeMarino took possession of the Leased Premises in 2016 and immediately began the environmental remediation work which was the condition of the Lease in lieu of rental payment. DeMarino brought to the Premises the equipment necessary to turn the yard waste at the Premises into clean topsoil and to remove the processed top soil from the site. Early in the process, the DEC wrote to DeMarino indicating that William Myers of the DEC "went over the report with our in house expert, his only response was 'it's almost too clean' should be good for mixing with compost for topsoil."

40.     At regular intervals, pursuant to 6 NYCRR Part 360, the DEC issued a "SOLID WASTE MANAGEMENT FACILITY INSPECTION REPORT" during the pendency of DeMarino's work, noting progress with the work along with observations, requirements and recommendations. On May 23, 2019, the DEC noted that 135,701+ yards of yard waste had been processed and taken off site and that certain areas of the Premises examined after pits were dug up to 18 feet below grade that would require "extensive excavation, sorting and remediation." This revelation came as a surprise not only to the DEC but also to DeMarino, which was only beginning to realize how greatly Tuxedo had underreported the amount of yard waste which had been dumped at the Premises.

41.     Between 2016 and the majority of 2019, DeMarino continued remediation work and interacted with the DEC to ensure compliance, all without incident. Both Tuxedo and the DEC

regularly communicated their satisfaction with the work to DeMarino. In 2019, Tuxedo and the DEC advised DeMarino that it wanted DeMarino to bring in an additional screener plant to perform the remediation work more expeditiously. DeMarino purchased an additional screener to comply with Tuxedo's requirements at a cost in excess of $100,000. Although at this point the scope of work under the Lease had greatly expanded, DeMarino understood that it would be compensated for its work through use of the Leased Premises through the term and the option period. This was the first instance that Tuxedo or the DEC ever raised an issue with regard to the speed of progress of the remediation work and its timing was linked to the DEC's May 23, 2019 report which revealed that the Premises required significantly more remediation than Tuxedo or the DEC anticipated prior to that time.

42.     Late in 2019, mere months after purchase of the second screener plant, Tuxedo's new town supervisor Kenneth English advised DeMarino that the Premises needed to be completely remediated by the end of calendar year 2019 and DeMarino was effectively fired. Mr. English had recently been elected a town supervisor and sought to reallocate town work to political cronies. Mr. English advised DeMarino that Tuxedo would be soliciting bids to complete the remediation work but no bid request was every submitted by Tuxedo. No explanation was provided by Mr. English as to the radical change of attitude over the course of just a few months, even in the face of years of diligent work by DeMarino which had received nothing but praise by Tuxedo and the DEC.

43.     Mr. English's verbal advice that Tuxedo would be breaching the Lease was followed up with materially identical correspondences dated March 11, 2020 and March 17, 2020, in which Tuxedo's counsel advised that "pursuant to the Order of the Town Board and in accordance with the requirements of the New York State Department of Environmental

Conservation you are hereby directed to remove all your equipment and personal property… from [the Premises] within ten (10) days from this date." No reason was given for Tuxedo's purported termination of the Lease. If any DEC rule were violated, the Lease requires notice and time to cure, but neither of the March letters provides no such notice, much less time to cure, nor does it any way comply with the terms of the Lease. Tuxedo, through counsel, advised that DeMarino was "trespassing," and that "the police are notified." By "notification" to the police, counsel meant that he had carbon copied the Tuxedo chief of police, Arthur Abbot, on the email advising counsel of Tuxedo's position, indicating a level of familiarity inappropriate to a commercial lease transaction. Counsel further advised that Tuxedo was "merely complying with the instructions from the DEC," but neither the March 11, 2020 or March 17, 2020 correspondences make any reference to instructions from the DEC, nor would any such "instruction" serve to undermine DeMarino's rights under the Lease. Indeed, counsel for Tuxedo feigned naiveite at the very existence of the Lease, stating that "[i]n your letter the other the day you referenced an Agreement with the Town. I am unaware of any agreement….And that may explain a lot." Counsel did not explain how a 23-page lease came into existence which identified his firm as the entity to receive notices, implying that his firm was the one that drafted the Lease in the first instance.

44. Since the March correspondences, Tuxedo, through counsel, has fabricated a number of reasons why DeMarino must vacate the premises, including removal of the second screener it specifically purchased at the behest of Tuxedo. Tuxedo also stated that "until [DeMarino] vacates the property, the Town is unable to move forward and meet the testing and other site requirements of the DEC." Counsel does not explain in his correspondence how the DEC was able to regularly test the Premises since at least 2016 with DeMarino present without any controversy. As recently as April 24, 2020, counsel for Tuxedo has threatened to remove hundreds

of thousands of dollars of equipment "at [DeMarino's] expense" and advised that Tuxedo "simply wants [DeMarino] off the site now." Per its custom, Tuxedo set forth no legal basis for setting aside the Lease or any legal basis for engaging in self-help.

45.  More to the point, although Tuxedo claimed that DeMarino had failed to keep to a DEC timeline, no such timeline was ever communicated to DeMarino and, indeed, the compliance deadlines set forth in the 2011 Order by Consent, as modified by the 2016 Modification, either did not pertain to DeMarino's work or had passed in advance of execution of the Lease. Approximately half a decade has passed between entry of the 2011 Order by Consent and Perfect Cut's eviction from the Premises for failing to make any progress on the environmental remediation work. Thus, any claim that DeMarino had failed to adhere to a timeline was nothing more than a pretext to effectuate a politically-motivated plan to remove a politically out-of-favor contractor from the Leased Premises and to disavow the existence of the Lease. The simple reality of the remediation work was that the DEC had no real understanding of the scope of work necessary to remove organic materials from the site as part of the ordered remediation plan either contemporaneous to or after entry of the 2011 Order on Consent. As DeMarino diligently proceeded with the remediation work, the DEC, in consultation with Tuxedo, carefully monitored DeMarino's work, found it fully compliant and identified additional work to bring the Premises into compliance with New York law. DeMarino carefully complied with the expanded scope of remediation work to both Tuxedo and the DEC's satisfaction, until new town supervisor Kenneth English decided the work should go to a more politically-connected contractor.

46.  At the current time, DeMarino has been locked out of the Premises and is unable to access the Leased Premises or to access its property, in clear violation of the Lease. The remediation work under the Lease is approximately 75% complete and DeMarino remains poised

to complete the rest, in compliance with both the Lease and DEC requirements. Tuxedo, now having obtained the benefits of the Lease, has decided to disavow its very existence and keep for itself all the benefits of DeMarino's three-plus years of work. DeMarino has now completed easily more than $1.5 million of remediation work, but in exchange for loyal service, Tuxedo purports to unilaterally terminate the Lease and disavow any further obligation to DeMarino despite DeMarino's significant devotion of capital and labor, all in the name of political advantage as a new town supervisor had come into office.

## COUNT I – BREACH OF CONTRACT

47. DeMarino hereby incorporates by reference the allegations of all the preceding paragraphs as if set forth at length herein.

48. DeMarino entered into a valid and binding contract with Tuxedo, specifically, the Lease.

49. DeMarino performed any and all conditions precedent and obligations for which it is entitled to possession of the Premises under the Lease including, but not limited to, peaceable enjoyment of the Leased Premises through the end of the term of the Lease.

50. Tuxedo has failed and refused to allow DeMarino peaceable enjoyment of the Leased Premises and, accordingly, has breached the Lease.

51. DeMarino has been damaged by Tuxedo's failure to perform its obligations under the Lease.

## COUNT II – *QUANTUM MERUIT*

52. DeMarino hereby incorporates by reference the allegations of all the preceding paragraphs as if set forth at length herein.

53. Before entering into the Lease, and at the request of Tuxedo, DeMarino, in good

faith, provided Tuxedo remediation work relative to the Premises.

54. In addition, during and before the pendency of the Lease and at the special insistence and request of Tuxedo, DeMarino, in good faith, provided certain other services to DeMarino, as explained above.

55. Tuxedo accepted those services freely.

56. DeMarino reasonably expected to receive compensation from Tuxedo for those services and was induced to enter into the Lease in consideration for that unpaid work.

57. The reasonable value of those services is $100,000.

58. Demand has been made for Tuxedo to perform its obligations relative to DeMarino's work prior to execution of the Lease, to no avail.

59. DeMarino has been damaged by Tuxedo's non-payment.

## **COUNT III – UNJUST ENRICHMENT**

60. DeMarino hereby incorporates by reference the allegations of all the preceding paragraphs as if set forth at length herein.

61. Before entering into the Lease, and at the request of Tuxedo, DeMarino, in good faith provided Tuxedo remediation work relative to the Premises.

62. In addition, during and before the pendency of the Lease and at the special insistence and request of Tuxedo, DeMarino in good faith provided certain other services to DeMarino, as explained above.

63. Under these circumstances, equity and good conscience demand that Tuxedo give restitution for its receipt of the benefits that DeMarino conferred, in the amount of the reasonable value of the services.

64. Tuxedo was enriched as a result of the services that DeMarino performed; the

reasonable value of those services is $100,000.

65. Demand has been made for Tuxedo to perform its obligations relative to DeMarino's work prior to execution of the Lease, to no avail.

66. DeMarino has been damaged by Tuxedo's non-payment.

### COUNT IV – PROMISSORY ESTOPPEL

67. DeMarino hereby incorporates by reference the allegations of all the preceding paragraphs as if set forth at length.

68. Tuxedo promised DeMarino that its work was in compliance with the Lease and, as such, it had no basis to terminate or otherwise communicate a default in its written terms.

69. In reliance on Tuxedo's promises, DeMarino spent in excess of $100,000 on a screener plant that it did not otherwise need and has no use for other than to perform the remediation work under the Lease.

70. DeMarino has been injured by its reliance on Tuxedo's promise not to interfere with DeMarino's rights under the Lease.

### COUNT V – DECLARATORY JUDGMENT (28 U.S.C. § 2201)

71. DeMarino hereby incorporates by reference the allegations of all the preceding paragraphs as if set forth at length.

72. There presently exists between DeMarino and Tuxedo an actual and justiciable controversy with respect to DeMarino's interest in the Lease an in the existence of the Lease, which Tuxedo has denied.

73. DeMarino is entitled to a declaration that the Lease is enforceable as-written and that Tuxedo has violated the Lease by barring DeMarino access to the Leased Premises through its acts of self-help.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, E. DeMarino Trucking, Inc. hereby demands judgment in his favor and against Defendants, Town of Tuxedo, as follows:

A. For compensatory and consequential damages for Tuxedo's breach of contract;

B. For compensatory damages *quantum meruit* or unjust enrichment;

C. For compensatory and consequential damages on the theory of promissory estoppel;

D. For an order declaring that:

   i. The Lease is binding upon the parties;

   ii. Tuxedo has breached the Lease by withholding possession of the Leased Premises from DeMarino;

E. An award of Plaintiff's costs and reasonable attorneys' fees; and

F. For such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, E. DeMarino Trucking, Inc. hereby demands a trial by jury on all issues so triable of right.

Dated: June 22, 2020               Respectfully submitted,

                                   **FILOSA GRAFF LLP**

                                   */s/ Gregory N. Filosa*
                                   Gregory N. Filosa, Esq. (GF-5680)
                                   111 John Street, Suite 2510
                                   New York, NY 10038
                                   Tel: (212) 256-1780
                                   Fax: (212) 256-1781
                                   gfilosa@filosagraff.com

**FERRARA LAW GROUP, P.C.**

Ralph P. Ferrara, Esq. (to be admitted pro hac vice)
50 W. State Street, Suite 1100
Trenton, New Jersey 08608
Telephone: (609) 571-3738
Facsimile: (609) 498-7440
ralph@ferraralawgp.com

*Counsel for Plaintiff, E. DeMarino Trucking, Inc.*